In re Herbert **BIDLOFSKY** and **Sharon Bidlofsky, Debtor.**

Paul **BOROCK, Trustee, Plaintiff,**

v.

Herbert **BIDLOFSKY, Sharon Bidlofsky, Alicia Bidlofsky, Murray Bidlofsky, Comerica Bank, a State Banking Association, and Bernard Bocknek, Jointly and Severally, Defendants.**

George **JANIS** and Mary **Janis, Plaintiffs,**

v.

Herbert **BIDLOFSKY** and **Sharon Bidlofsky, Defendants.**

Bankruptcy No. 84–04064–R.
Adv. Nos. 85–0151–R, 85–0152–R.

United States Bankruptcy Court, E.D. Michigan.

Dec. 20, 1985.

---

William Winshall, Southfield, Mich., for Paul Borock, Trustee.

Keith Moir, Southfield, Mich., for George & Mary Janis.

Jay Kalish, Southfield, Mich., for Herbert & Sharon Bidlofsky, Alicia Bidlofsky and Murray Bidlofsky.

Allen Zemmol, Comerica Inc., Corporate Legal Dept., Detroit, Mich., for Comerica Bank.

## MEMORANDUM OPINION

STEVEN W. RHODES, Bankruptcy Judge.

### I. *Introduction*

These two adversary proceedings were consolidated for trial. In *Janis v. Bidlofsky*, George and Mary Janis allege that the debt owed to them by the debtors, Herbert and Sharon Bidlofsky, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). In *Borock v. Bidlofsky*, Paul Borock, the trustee, alleges practically every cause of action conceivable under the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* As narrowed by the Court following the close of the trustee's proofs, however, the trustee claims:

A. That the Court should not grant a discharge to the debtors because they transferred, removed, and concealed property within one year of filing their petition, (11 U.S.C. § 727(a)(2)(A) );

B. That the Court should not grant a discharge to the debtors because they transferred, removed, and concealed property of the estate after the petition was filed, (11 U.S.C. § 727(a)(2)(B) );

C. That the Court should not grant a discharge to the debtors because each made a false oath in their petition and in testimony at the meeting of creditors held pursuant to 11 U.S.C. § 341, and because Herbert Bidlofsky made a false oath in his testimony during his deposition,[1] (11 U.S.C. § 727(a)(4)(A) );

D. That transfers of the debtors' property within one year of the filing of the petition should be avoided, (11 U.S.C. § 548(a) );

E. That transfers of the debtors' property should be avoided under state law, (11 U.S.C. § 544(b) and M.C.L.A. § 566.11 *et seq.*, (The Uniform Fraudulent Conveyance Act) );

F. That the debtors' claim of exemption of the funds in their bank accounts be disallowed;

G. That the defendant Comerica Bank should be ordered to turn over funds that it held on deposit for the debtors on the date of filing, (11 U.S.C. § 542(a) );  and,

H. That the debtors and their prior counsel, defendant Bernard Bockneck, who has not defended this action, should be held jointly and severally liable for certain acts of fraud.

Also in *Borock v. Bidlofsky*, the defendant Comerica Bank has a cross-claim against the debtors in which it claims that because it released the debtors' deposits to them, it should have a judgment against them to the extent of any judgment entered against it in favor of the trustee.

The debtors deny any wrongdoing such as might except the Janises' debt from discharge under Section 523 or bar their discharge under Section 727. They also deny any fraudulent conveyance under Sections 544(b) or 548, or under the Uniform Fraudulent Conveyance Act, and deny that their claim of exemption is improper.

1.  The deposition of Sharon Bidlofsky was never taken.

## II. *Findings of Facts*

### A. *The Janis Mortgage*

George Janis testified that he is retired from the tool and die manufacturing business and lives in Traverse City, Michigan. He had met the Bidlofskys through his daughter, with whom the Bidlofskys were close friends.

In early 1982, Herbert Bidlofsky went to Traverse City to visit George Janis to ask for a loan, which he proposed to be secured by a mortgage on his personal residence. Bidlofsky said he needed $20,000 and that he was losing his home in two or three days. After Janis's daughter recommended the Bidlofskys, Janis agreed to make the loan.

On March 23, 1982, Bidlofsky sent a letter (Plaintiff's Exhibit 6) to Janis enclosing a promissory note and a mortgage, asking Janis to approve them and return them to him. Bidlofsky indicated that he would file the mortgage in the Oakland County Register of Deeds Office.

On March 25, 1982, Janis returned the note and mortgage (Plaintiff's Exhibit 8) to Bidlofsky together with a $20,000 check (Plaintiff's Exhibit 44). In a handwritten note, (Plaintiff's Exhibit 7) included with these documents, Janis specifically requested Bidlofsky to have Sharon Bidlofsky sign the mortgage before filing. However, Sharon Bidlofsky never signed the mortgage and it was never recorded.

The note called for monthly payments of $500 to commence on May 1, 1982. Bidlofsky sent four checks in payment on this note, as reflected in Plaintiff's Exhibit 28, a record of payments. A $500 payment was made on May 1, 1982. A $500 check was sent on June 2, 1982, but was dishonored twice for insufficient funds (Plaintiff's Exhibit 29). A $1000 check was sent on July 16, 1982, but was also twice dishonored for insufficient funds (Plaintiff's Exhibit 30). Thereafter, $1000 was paid by a cashier's check. No further payments were made on this obligation until the Bidlofskys sold their home in September of 1983, as discussed below.

Shortly after Bidlofsky defaulted on this note, Janis went to the Oakland County Register of Deeds Office and was told that there was no record of his mortgage. With the help of his daughter and son-in-law, to whom the Bidlofskys also owed money, Janis retained an attorney, John Foley.

Foley filed a suit for the Janises against the Bidlofskys in the Oakland County Circuit Court and also filed a notice of lis pendens (Plaintiff's Exhibit 31). Shortly after that, Foley received a call from defendant Bernard Bockneck, an attorney who represented the Bidlofskys, in which Bockneck indicated that the suit made it impossible for the Bidlofskys to sell their home. Thus Bockneck proposed that settlement negotiations be undertaken. However, Janis rejected this, and Foley so informed Bockneck.

Herbert Bidlofsky then called Foley directly to discuss settlement. Foley testified that in that conversation Bidlofsky made clear the necessity of compromise since none of his creditors were going to be paid in full from the closing. Foley further quoted Bidlofsky to say, "I'm not getting a dime out of this." Foley further testified that Bidlofsky's offer included the entry of a consent judgment if there was a default in the monthly payments that were agreed upon.

In any event, Foley and Janis then decided to agree to accept $10,000 at the closing and the balance in the form of a note with a new payment schedule. Foley further testified that in reaching the decision to compromise this way, he relied on the fact that no other creditors would compromise; thus, he concluded his compromise was the "hingepin". He also relied on the fact that the Bidlofskys would receive no money from the closing.

To assure this, Foley asked another attorney, Donald Robinson, to attend the closing. Before the closing, Robinson showed Foley a closing statement (Plaintiff's Exhibit 10), and Foley assumed that the escrow balance of $54,062.59 shown on it was for the creditors.

Foley never saw Plaintiff's Exhibit 22, the mortgage disbursement schedule, which discloses that the Bidlofskys received $50,943 from the closing.

Robinson drafted a discharge of lis pendens (Plaintiff's Exhibit 32), a stipulation for dismissal, and a consent judgment (Plaintiff's Exhibit 43). In preparation for the closing, he talked with Bockneck about these documents, and confirmed that at closing the Janises would receive $10,000 plus a note for the balance due and that the dismissal and judgment would be signed at closing. In this conversation, Bockneck told Robinson that creditors would receive 50% on their claims and that the Bidlofskys would receive nothing.

### B. *The Louis Gordon Obligation*

Another witness testified to somewhat similar circumstances prior to the closing. Louis Gordon, an attorney, had loaned $9,000 to Herbert Bidlofsky in 1980. In 1983, this loan was in default. As they were neighbors, Gordon would talk with Bidlofsky about this often, and in those conversations Bidlofsky assured Gordon that he would be paid when Bidlofsky sold his house. However, only three days before the closing Gordon found out about the upcoming sale, not from Bidlofsky, but rather by accident through a neighbor. He immediately filed a notice of lis pendens, which resulted in a call from Bidlofsky asking for a meeting.

At the meeting, Bidlofsky asked Gordon to accept less then the full amount of his claim because his house was his only asset and he needed money to go into business. Bidlofsky further stated that he owed his father five or six thousand dollars [2] as well as Gordon's wife and her father. However, Gordon declined any compromise and was paid in full at the closing.

### C. *The G. Aaron Builders Obligation*

Yet another attorney, Jerry Weinstein, testified to similar circumstances prior to the closing. He stated that he was retained to represent G. Aaron Builders to collect a debt from Herbert Bidlofsky. He filed suit in May of 1983 and obtained a judgment on June 8, 1983. In a telephone call on September 12, 1983, Weinstein asked Bidlofsky to pay the judgment from the proceeds of the sale of his home, which had already taken place. Bidlofsky declined, claiming that he had received nothing from the sale and offering to provide documents to prove this. There was no evidence concerning whether that proof was provided.

### D. *The Murray Bidlofsky Obligation*

Prior to the closing, Murray Bidlofsky had given his son, Herbert Bidlofsky, substantial sums of money. Murray Bidlofsky testified that he gave his son money whenever he needed it. He has no records of these amounts or the dates. He stated they were definitely loans and not gifts, but then had no specific repayment terms and carried no interest. His son was simply to repay the loans when he could.

Plaintiff's Exhibit 9 consists of copies of checks he gave his son from 1980–1983. However, these checks do not reflect all of the amounts given to his son during that time period and there were additional amounts given before 1980. Specifically he recalled giving his son $10,000 to prevent a sheriff's sale of his home, which is not included in Plaintiff's Exhibit 9. The checks in Plaintiff's Exhibit 9 total $23,000.

Murray Bidlofsky received $12,500 from the proceeds of the sale of the debtor's home. That payment is not reflected in any of the closing documents. He is not sure at this time how much his son owes him. He does not know if he was listed as a creditor; he did not receive notice of the bankruptcy petition.

Murray Bidlofsky and Jerry Weinstein gave evidence in relation to another asset of the debtors—a 1979 Lincoln automobile. Prior to 1982 it was titled to Herbert Bidlofsky. On June 2, 1982, the title was transferred to Murray Bidlofsky, who said

---

**2.** Bidlofsky testified that he told Gordon that his debt to his father was $25,000.

that this was done at Weinstein's suggestion, to secure his son's debt to him. Weinstein denied this.[3]

### E. *The Closing*

A large number of creditor representatives attended the closing. The Bidlofskys were represented by Bockneck, but were in another room nearby. The purchasers were represented by attorney Jeffrey Ishbia. Robinson, representing the Janises, asked Bockneck again whether the Bidlofskys would receive any money from the closing and whether the creditors were receiving all the money. Bockneck responded that the Bidlofskys were to receive nothing and that the creditors would receive everything. When Bockneck delivered to Robinson the new promissory note (Plaintiff's Exhibit 12) and check for $10,000, Robinson delivered a discharge of the lien (Plaintiff's Exhibit 32). At the closing, Robinson saw a closing statement (Plaintiff's Exhibit 10) and the title policy commitment (Plaintiff's Exhibit 11), but neither contained a complete list of creditors to be paid. He relied on the fact that Plaintiff's Exhibit 10 showed no disbursement to the Bidlofskys. Robinson did not see the disbursement schedule (Plaintiff's Exhibit 22) at the closing. If he had learned that the Bidlofskys would receive any money from the closing, he would not have delivered the discharge of lis pendens and would have contacted his clients for further instructions.

Ishbia testified (Plaintiff's Exhibit 23) that the Bidlofskys told him that they were to receive nothing from the sale, although he does not recall Bockneck saying that. He recalls that several creditors agreed to take less than the full amounts of their claims based on this representation. Neither he nor the creditors saw any document showing that the Bidlofskys would receive anything.

At the closing on the sale of their home on September 6, 1983, the Bidlofskys received $50,943 (Plaintiff's Exhibit 22).

### F. *The Bankruptcy Petition And Schedules*

The bankruptcy petition was signed on November 1, 1984 and filed on November 15, 1984. In the Statement of Current Income and Current Expenditures attached, the debtors indicated monthly take home pay of $2000. Expenditures were listed only for rent, utilities, food, laundry and cleaning, newspapers, medical expenses, and insurance; it was indicated that there were no expenditures for clothing, transportation, recreation, dues, taxes, alimony, or other expenses.

In the Statement of Financial Affairs, the debtors indicated that Herbert Bidlofsky had earned $18,000 in 1983 and $15,000 in 1982; Sharon Bidlofsky earned $6,000 in each of these years. To question 4a regarding bank accounts within the past two years, the debtors responded "Comerica Bank Checking Account—minimal balance". To question 6 regarding property held for another person, the debtors responded, "None". To question 9 regarding whether others held any property in which they have any interest, the debtors responded, "None".

In Schedule B, the Statement of All Property of Debtor, the debtors listed no real property, $25 in cash on hand; $1000 in "usual household furniture and furnishings located at residence"; $1500 in a "1979 Lincoln—does not run—needs engine"; $8000 in a "1979 boat subject to mortgage on A-2". No other property was listed, and specifically no jewelry, and no deposits of money in banks or with landlords or auto leasing companies. The total value of the assets listed was $11,525.

In Schedule B–4, all of this property was claimed as exempt except that the boat was exempted only to the extent of $500.

---

**3.** In October of 1983, after the closing, Weinstein filed a motion in *G. Aaron Builders v. Bidlofsky* to set aside the transfer of this automobile from Herbert Bidlofsky to Murray Bidlofsky. In settlement of this motion it was agreed that G. Aaron Builders would have a lien on the vehicle in the amount of $3000 (Plaintiff's Exhibit 33).

The total liabilities stated were $81,-101.42. Murray Bidlofsky is not listed as a creditor on Schedule A–3.

### G. *The Bank Accounts*

There was evidence and stipulations as to the following Comerica bank accounts in existence at about the time of filing:

| Plaintiff's Exhibit | Name | Type | 11/1/84 Balance | 11/15/84 Balance |
|---|---|---|---|---|
| 34 | H Bidlofsky Builder | Business Checking | $644.50 | $ 419.75 |
| 35 | S. Bidlofsky | IRA | 0 [4] | $2000.00 |
| 36 | S. Bidlofsky | Personal Checking | $240.25 | $ 742.03 [5] |
| 37 | S. Bidlofsky | Savings | ? [6] | $2619.08 |
| 38 | H. or S. Bidlofsky | Savings | $4102.08 | $3702.08 |

Plaintiff's Exhibit 38 further reflects that the Herbert Bidlofsky or Sharon Bidlofsky savings account was opened on September 9, 1983 (three days after the house closing) with a deposit of $27,500. Plaintiff's Exhibit 34 also reflects that on the same date, September 9, 1983, the "Herbert A. Bidlofsky Builder business checking account" was opened with a deposit of $7243.20.

### H. *The Debtors' Other Assets*

With respect to his assets at the time of filing, Herbert Bidlofsky testified at trial that his jewelry consisted of a watch and a chain. He had lost a gold bracelet in 1982 or 1983 which his parents replaced for him in 1985. From 1982 until 1984 he had a business, H.B. Builders, which had had construction contracts for government housing projects. In addition to the Comerica Bank business checking account, there had been a business checking account at the Liberty State Bank but it was closed pre-petition. Although he had previously given his landlord a security deposit, this was later credited as rent when the landlord saw the work that Bidlofsky was doing in their apartment. Finally, Bidlofsky indicated that they had a 1984 Toyota automobile which they leased for $300 per month.

With respect to her assets at the time of filing, Sharon Bidlofsky testified that her jewelry consisted of earrings, her wedding band, a ring, a watch, and bracelets. There was a savings account at Liberty State Bank in addition to the business checking account. One of the savings accounts was actually a trust account for her daughter Allisa, funded by Allisa's employment wages, although Allisa was 18 years old at the time. There was also a trust account for her son Randy in her name, which was likewise funded with his money. She had received $2000 in the beginning of November, 1984 from her mother's estate which she then deposited into the IRA account.[7] At the time of the bankruptcy, she was regularly driving the 1979 Lincoln, although both drove the Toyota also.

### I. *The § 341 Meeting of Creditors*

On January 8, 1985, the first meeting of creditors was held pursuant to 11 U.S.C. § 341. The transcript of this meeting was admitted as Plaintiff's Exhibit 24. At the meeting, the debtors testified [8] that their checking account had $190 and their savings accounts had $7400. They had no

4. Sharon Bidlofsky opened this Individual Retirement Account on November 8, 1984 with a deposit of $2000.

5. The parties stipulated that this amount is $348.36; nevertheless the bank statement (Plaintiff's Exhibit 36) clearly shows that the amount is $742.03.

6. There is no direct evidence of this amount, but the records spanning 1984 suggest that it was approximately the same.

7. Sharon Bidlofsky later corrected this testimony to indicate that the $2000 had been given to her by her sister from her mother's estate in June of 1983, but had been used to pay estate bills. Therefore, she took $2000 from her sav-ings to start the IRA as a kind of substitution for the money from her mother's estate, since her mother's intent was for her to save this $2000.

This "correction" was advanced in plain response to the testimony of Jackie Mines, a Comerica Bank officer. She stated that the bank records clearly indicated that the $2000 IRA deposit came from a savings account to which small deposits were made over a period of time and from which this amount was withdrawn when the IRA was opened.

8. The examination of the debtors at this meeting was quite lengthy; only pertinent portions of their testimony will be discussed.

IRAs. In their possession they had only one automobile, a 1979 Lincoln. The savings accounts are jointly held. Sharon Bidlofsky had a checking account at Liberty State Bank until 1½ years previously. About half the money in her daughter's account is actually her daughter's. There is a five hundred dollar security deposit on the Toyota. There is a $850 security deposit with the landlord. No one holds title to a car for them. With respect to the money he received from his parents Herbert Bidlofsky testified:

Q You indicate that you borrowed money from your parents, is that correct?
A Over the years. Not specifically borrowed, but they've just helped me out because I haven't been working.
Q Well, you indicated that you owed them money.
A Yes, I do.
Q And how much is it that you owe them?
A Over the years, probably five, six thousand dollars.

(Tr. p. 37, Plaintiff's Exhibit 24)

### J. The Post-Petition Withdrawals

#### (1) The Prologue

Jackie Mines testified that she has been the assistant manager of the Comerica Bank at 14 Mile Road and Farmington for ten years. She has known the Bidlofskys since September of 1983.

On December 3, 1984, she saw the Bidlofskys' name on a Comerica daily bulletin of bankruptcies (Plaintiff's Exhibit 27) and immediately placed a "hold" on their account due to a boat loan that the bank had with the Bidlofskys. However the reason for the "hold" subsequently changed; although the Bidlofskys had indicated their intent to reaffirm the boat loan, Borock, the trustee, wrote a letter to Allen Zemmol, the bank's attorney, requesting the hold due to his potential interest in the several accounts.

Beginning shortly after Mines became aware of the bankruptcy, she had numerous conversations with the Bidlofskys about the holds on their accounts. They would try to withdraw funds, or ask for her permission to do so, but she would refuse, explaining that they could withdraw funds from the checking account when it was released, but they could not use their savings accounts. Mines directed further questions to Zemmol. Later on, the Bidlofskys would simply ask if the funds had been released yet, to which she responded in the negative.

On December 7, 1984, shortly after the Bidlofskys were advised of the Comerica holds on their accounts, they filed a petition to amend Schedules B2 and B4, adding as assets two savings accounts with approximately $3300 in each, and exempting both. The petition alleged that these accounts had been inadvertently omitted.

On December 10, 1984, Jay Kalish, the debtors' attorney, wrote a letter to Zemmol identifying by number a checking account and three savings accounts. Kalish requested Zemmol to release any post-petition deposits into the checking account. Zemmol forwarded this letter to Mines, who wrote on it the account balances as of December 4, 1984 (Plaintiff's Exhibit 27).

On January 8, 1985, Borock wrote a letter (Defendant's Exhibit B) to Zemmol indicating that it had come to his attention that the bank had frozen the Bidlofskys accounts, and that the bank was authorized to release the post-petition deposits into Sharon Bidlofsky's checking account.

On January 15, 1985, William Winshall, the trustee's attorney, wrote a letter (Defendant's Exhibit C) to Kalish, with copies to the Bidlofskys and Zemmol. Winshall enclosed Borock's letter of January 8, 1985, releasing Sharon Bidlofsky's checking account. Winshall further advised Kalish, however, that the savings accounts were not being released, "as the trustee believes that these funds may be assets of the bankruptcy estate and as such should be turned over to the trustee." Zemmol sent a copy of this letter to Mines with authorization to release the checking account (Plaintiff's Exhibit 27).

On February 1, 1985, Winshall sent a letter (Plaintiff's Exhibit 45; Defendant's Exhibit D) to Zemmol advising that litigation concerning the Bidlofskys' bank accounts had been prepared and requesting that the accounts be "frozen" until the litigation is resolved.

On February 6, 1985, Winshall filed and served the suit, *Borock v. Bidlofsky*, objecting to the debtors' claim of exemption in the two savings accounts, on the grounds that the funds in them were obtained by a fraud on their creditors at the time the home was sold in September of 1983.

### (2) *The Withdrawals*

At 2:58 p.m. on February 28, 1985, Sharon Bidlofsky withdrew $1500 from her savings account with Comerica Bank. At 3:40 p.m. on the same day, she withdrew an additional $1175 from the same account. On the next day, March 1, 1985, she withdrew $3500 from their joint savings account with Comerica Bank. The total of these three withdrawals was $6175.

### (3) *How It Happened According to Sharon Bidlofsky*

Sharon Bidlofsky testified that this happened as follows: On February 28, 1985 she went to a branch of the bank at Orchard Lake Road and 15 Mile Road, which was not her usual branch, for the purpose of depositing her paycheck. She sometimes went to this branch because it is near the grocery store where she shops. She asked the teller whether there were any holds on her accounts. The teller asked her to wait and left. When the teller returned, the teller responded that there were no holds. Sharon Bidlofsky then filled out the first withdrawal slip for $1500, concluding that the holds had been released and that it was therefore proper to withdraw the money.

After discussing the first withdrawal with her husband, Sharon Bidlofsky went back to the same branch and withdrew $1175. The next day she withdrew $3500 at the same branch.

### (4) *How It Happened According to Comerica*

Jackie Mines testified that it was unlikely that Sharon Bidlofsky made the withdrawals in the manner she testified. The Comerica computer was set up to respond to a specific inquiry regarding a hold but a hold would not appear through the computer in the normal processing of a withdrawal by a teller. Thus Mines concluded that if Sharon Bidlofsky had asked about a hold, the teller's inquiry to the computer would have revealed it; more likely, Sharon Bidlofsky simply presented a withdrawal slip, the teller's processing of which did not reveal the hold.

### (5) *After the Withdrawal*

Within a few days, Mines became aware of the withdrawals when they were rejected internally at the bank due to the holds. That day Sharon Bidlofsky was at the drive-in window, and Mines told her that the withdrawals were improper and that the bank needed the money back or a court order. To that Sharon Bidlofsky responded that this was the bank's problem.

A few minutes later Herbert Bidlofsky telephoned Mines, complaining about her treatment of his wife. In the course of that conversation Mines again advised that the bank needed the money back and that the withdrawals were allowed in error. Mines had no further contact with the Bidlofskys, but rather called Zemmol.

On March 12, 1985, Winshall wrote two letters. To Kalish, the Bidlofskys' attorney, he sent a letter demanding return of the withdrawn funds, with copies to the Bidlofskys and Zemmol. To Zemmol, he sent a letter advising that if the Bidlofskys did not return the money, the bank might be added as a party defendant in the adversary proceeding.

On March 21, 1985, Winshall filed a motion to require the Bidlofskys to return the money. At the hearing on this motion on March 27, 1985, Kalish advised the Court that some of the money had been used to pay bills and repay debts but $1180 was left. At the conclusion of the hearing, the Court ordered the Bidlofskys to return the

money that remained and to provide a complete accounting of where the balance had gone, with documentation. The Bidlofskys complied with this order promptly.[9]

On May 31, 1985, the complaint was amended to add Comerica Bank as a party, claiming that the bank was liable for the $4995.00 that the Bidlofskys had withdrawn and not returned.

### K. Herbert Bidlofsky's Deposition

On April 5, 1985, Herbert Bidlofsky testified in a deposition (Plaintiff's Exhibit 25) concerning the Janis loan, the loans from his parents, the closing on the sale of his home, and the payments to creditors from the closing.

The deposition of Herbert Bidlofsky was continued on May 2, 1985 (Plaintiff's Exhibit 26), at which time he testified that he had a $810 security deposit on his apartment, and testified concerning the family's vehicles. He further testified to the circumstances surrounding the preparation of the bankruptcy petition and schedules, and the preparation of the answer to the complaint. He also testified concerning his wife's withdrawal of the money from Comerica.

On September 18, 1985, Herbert Bidlofsky's deposition was concluded. His prior testimony was reviewed and he gave further testimony concerning his obligations in September of 1983.

### L. The Purported Second Amendment To The Petition

Plaintiff's Exhibit 48 is an unsigned copy of a Petition to Amend Schedule A–3 in which the debtors propose to add a creditor; they allege that this is a no-asset case and that no creditor's rights will be prejudiced by the amendment. The petition is attached to a cover letter dated June 4, 1985 addressed to the Court. However, the original of the petition was never filed, according to court records.

## III. Discussion

### A. The Burden of Proof

█ The proponent of any claim involving fraud under 11 U.S.C. § 523 or § 727 or under the Michigan Uniform Fraudulent Conveyance Act has the burden of proof by clear and convincing evidence. Martin v. Bank of Germantown, 761 F.2d 1163 (6th Cir.1985).

### B. The Janises' Claim

█ The Janises seek to except from discharge the debt owed to them by the Bidlofskys pursuant to 11 U.S.C. § 523(a)(2)(A), which provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

The Janises have established by clear and convincing evidence the facts necessary to support their claim, in two distinct ways.

First, the Court finds that in connection with the initial loan of $20,000, the Bidlofskys falsely and fraudulently represented that the loan would be secured by a mortgage which both Sharon and Herbert Bidlofsky would execute and which would then be filed in order to perfect the security interest. As noted, Sharon Bidlofsky never signed the mortgage and it was never filed, although the debtors were specifically requested to do so by George Janis. The inference is clear that the Bidlofskys never

---

**9.** Plaintiff's Exhibit 1 is a receipt dated March 29, 1985, for $1180, given by Winshall to the Bidlofskys.

Plaintiff's Exhibit 52 is a letter from Paul Silverstein explaining that in December of 1984 and January of 1985 he lent the Bidlofskys $4500 for "personal living expenses", which was repaid on March 1, 1985.

Plaintiff's Exhibit 18 is a receipt from Dr. Steven Lash showing a payment on March 11, 1985, on the account of Allisa Bidlofsky. The amount shown on the exhibit, which is actually a thermofax copy of the original receipt, was altered on the copy from $430 to $480. There was no evidence concerning the circumstances of this alteration.

intended to give the Janises a valid, perfected mortgage in their home, contrary to their representation.

Second, the testimony of George Janis, Don Robinson, John Foley, Jeffrey Ishbia, Louis Gordon, and Jerry Weinstein overwhelmingly indicates that, contrary to the debtors' testimony, they and their attorney falsely represented to their creditors, including the Janises, on several occasions that they (the debtors) would receive nothing from the closing on the sale of their home in September of 1983. In fact, the debtors received $50,943. Therefore, the Court finds that the extension of credit granted by the Janises to the Bidlofskys at the closing, in the form of a note for the balance due at that time, was obtained by a false and fraudulent representation.

Accordingly, the Court will enter judgment in favor of the Janises against the Bidlofskys, declaring the debt to be nondischargeable under 11 U.S.C. § 523(a)(2)(A).

### C. *The Trustee's Claim Under 11 U.S.C. § 727(a)(2)(A)*

The trustee contends that the debtors' discharge should be barred under 11 U.S.C. § 727(a)(2)(A), which provides:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition.

The Court has already found that the debtors falsely represented to their creditors in connection with the closing on the sale of their home in September of 1983 that they (the debtors) would receive nothing, when in fact the debtors received $50,-943. Plainly, these representations were made for the purpose of delaying and defrauding the creditors, several of whom, like the Janises, compromised on their claims or agreed to extend further credit. And the false representation itself—that the debtors would receive no money from the closing—constituted concealment of their property. See 4 *Collier on Bankruptcy* ¶ 727.02[6][b] at p. 727–21 (15th ed. 1985).

■ However, this initial concealment took place more than one year before the petition was filed. The debtors thus argue that therefore 11 U.S.C. § 727(a)(2)(A) does not apply. The trustee argues that the debtors' concealment of property with the requisite intent continued through the time of bankruptcy and even after, and thus the statute does apply.

The Court concludes that the trustee's position has merit. See *Collier, supra,* ¶ 727.02[2], and the cases cited therein. Clearly, the debtors' concealment of their cash property which they received from the sale of their home continued through the time of bankruptcy, with the intent to delay their creditors. After the closing, Herbert Bidlofsky told Jerry Weinstein, a creditor's attorney, that he had received nothing from the sale and that he had the documentation to prove it. The concealment of the proceeds continued through the filing of the petition, in which they failed to identify the Comerica Bank accounts which had some funds remaining from the sale or any of the Liberty State Bank accounts into which some of the proceeds had originally been placed. That these omissions were willful and fraudulent, and not inadvertent as the debtors claim, is established below.

■ In this regard, the Court should note its conclusion that the trustee's claim that debtors fraudulently concealed property by transferring $12,500 to Murray Bidlofsky was not established by clear and convincing evidence. This claim rests upon the position that this transfer was not in repayment of a debt because there was no debt; Murray Bidlofsky had simply given his son money. There was some evidence in support of the trustee's position; Herbert Bidlofsky testified at the meeting of creditors that these were not loans, and

Murray Bidlofsky was never listed as a creditor. Moreover, there was no written evidence that these were loans, and no specific, agreed-upon terms for repayment. Nevertheless, Murray Bidlofsky, whose testimony the Court credits in this regard, testified that these were loans and he expected repayment when his son was able to repay, as he had in the past. Thus the Court concludes that the evidence was equivocal on whether this transfer was a fraudulent concealment or repayment of a loan, and to the extent the trustee's claim that the debtors' discharge should be denied is based upon this transfer, the claim is denied.

Nevertheless, for the reasons stated above, the Court concludes that the debtors' discharge should be denied under 11 U.S.C. § 727(a)(2)(A).

### D. *The Trustee's Claim Under 11 U.S.C. § 727(a)(2)(B)*

The trustee's claim under 11 U.S.C. § 727(a)(2)(B) relates primarily to the debtors' post-petition withdrawals from the Comerica Bank. This section provides:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(B) property of the estate, after the date of the filing of the petition.

The trustee contends that these withdrawals constituted a transfer and removal of property of the estate with intent to hinder and delay the trustee.

The debtors advance three defenses. First, they contend that the money was not property of the estate because they had properly exempted it. Second, they contend that they withdrew the money only because they thought they had a right to do so and not with any wrongful intent. Third, they contend that if the trustee had fulfilled his duty to collect the assets pursuant to 11 U.S.C. § 704, the withdrawals and the resulting loss to the estate never would have occurred.

The Court concludes that the trustee has sustained his burden of proof on this claim and that the debtors' defenses lack merit.

11 U.S.C. § 541(a)(1) broadly defines "property of the estate":

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

Thus, property of the estate clearly includes property which may be exempted by the debtor, or which may be necessary for a "fresh start". *Collier* ¶ 541.06 at 541–27. *See also* 11 U.S.C. § 542(a). Accordingly, the Court concludes that the money on deposit in the debtors' names at the time that their petition was filed was property of the estate despite the debtors' claim of exemption as stated in their amendment to their petition.

Along the same line, the debtor argues that the trustee never filed an objection to their claim of exemptions as provided in Bankruptcy Rule 4003(b), and that at the expiration of the thirty day objection period provided in that rule, the exempt property was no longer property of the estate. This rule provides:

The trustee or any creditor may file objections to the list of property claimed as exempt within 30 days after the conclusion of the meeting of creditors held pursuant to Rule 2003(a) or the filing of any amendment to the list unless, within such period, further time is granted by the court. Copies of the objections shall be delivered or mailed to the trustee and to the person filing the list and his attorney.

As noted, the meeting of creditors occurred on January 8, 1985; therefore, the

trustee had until February 7, 1985 to file his objection to the discharge. On February 6, 1985, the complaint in this adversary proceeding was filed, clearly setting forth an objection to this exemption.

■ The debtors argue that the trustee's objection should have been filed as an "objection", not as a complaint. But this argument unnecessarily elevates form over substance, and must be rejected. The plain purpose of the objection requirement is to give notice of the issue to the debtor. The trustee's complaint fairly placed the debtors on notice of his objection to their exemption and therefore that the money in the accounts was property of the estate, at least until the Court, after hearing, resolves the issue.

■ In their testimony, the debtors testified that they did not list these accounts initially because they thought they were exempt, that after the amendment which listed and exempted the accounts, they knew there was a dispute about the exemption, and that they thought that the release of the holds on the accounts meant that the dispute had been resolved in their favor. Thus they contend that when Sharon Bidlofsky was told on February 28, 1985 that there were no holds on their accounts, they innocently assumed that the dispute had been resolved in their favor and that the money was theirs.

Although this argument has some surface appeal, the Court must reject it for two reasons. First, the Court finds that Sharon Bidlofsky did not make the withdrawal in the manner she testified, that she did not ask about the hold, that she was not told there were no holds, and that she simply presented a deposit slip with the hope that it would be accepted. Thus the Court credits the testimony of Jackie Mines to the effect that if an inquiry about a hold had been made, the bank's computer would have shown it.

Second, the Court must conclude that all of the circumstances indicate by clear and convincing evidence that the withdrawals were made with the wrongful intent to hinder and delay the trustee. These circumstances include the debtors' fraud in the Janis transaction and in the sale of their home; the numerous false and inconsistent statements in the original schedule and in their testimony at meeting of creditors (which are reviewed in detail below); the debtors' total failure to schedule certain valuable assets; and the debtors' cavalier and callous attitude toward returning the money when the error was brought to their attention. These events manifest a pattern of dishonesty by the debtors in the conduct of their affairs, and the Court concludes that dishonesty infected their decision to withdraw the money from Comerica Bank when they were given that unfortunate and mistaken opportunity.

Finally the debtors argue that if the trustee had obtained a court order requiring the bank to turn over the funds on deposit or to "freeze" the account, as he is required to do under 11 U.S.C. § 704(1), none of this would have happened. This argument is advanced more vigorously by Comerica Bank in defense of the trustee's claim against it under 11 U.S.C. § 542, and the debtors have simply joined in it. Accordingly, the Court will discuss the issue thoroughly below when addressing that claim.

■ It is sufficient for present purposes to note the Court's ultimate conclusion that the trustee's violation of his duties under Section 704 does not relieve the bank of its duty under Section 542 or the debtors' obligation not to conceal or transfer assets of the estate.

Accordingly, the Court concludes that the debtors' discharge must be denied pursuant to 11 U.S.C. § 727(a)(2)(B).

E. *The Trustee's Claim Under 11 U.S.C. § 727(a)(4)(A)*

■ The trustee further contends that the debtors' discharge should be denied pursuant to 11 U.S.C. § 727(a)(4)(A), which provides:

(a) The court shall grant the debtor a discharge, unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account.

The specific false oaths argued by the trustee include the oath with respect to the petition and the schedules, the oath with respect to the testimony at the meeting of creditors, and the oath with respect to Herbert Bidlofsky's deposition testimony. The essence of the claim is that the debtors did not fully and properly disclose their assets when they filed for bankruptcy, including cash on hand, amounts on deposit at banks, jewelry, automobiles, and security deposits. It is further argued that the debtors have falsely answered questions concerning Sharon Bidlofsky's employment, their bank accounts, property held for others, and property in the hands of others. Finally the trustee argues that the Schedule of Current Income and Current Expenditures was false.

The debtors contend that any error in their schedules or testimony was inadvertent and not wrongful or fraudulent.

The Court concludes, again from all the circumstances in the case, that the trustee has met his burden of proof under this claim. In addition to the pattern of dishonest conduct earlier discussed, the Court notes that there are so many omissions, inconsistencies, and false statements that the debtors' claim of inadvertence must be rejected.

(1) The petition discloses $25.00 in cash on hand, but Herbert Bidlofsky testified at trial he had no idea where that figure came from.

(2) The petition indicated that there was no money in deposit in banks, whereas there was in fact $9000, approximately.

(3) The petition identified within the past two years only a Comerica checking account with a "minimal balance", when in fact there were at least four other accounts at Comerica, and two others at Liberty State Bank.

(4) The petition discloses none of the jewelry owned by the Bidlofskys.

(5) The petition did not disclose the 1984 Toyota automobile or the security deposit on it.

(6) The petition did not disclose the security deposit on the debtors' apartment.

(7) The petition did not disclose the two bank accounts that the debtors hold for their children.

(8) Sharon Bidlofsky gave conflicting and confusing testimony at the meeting of creditors and at trial concerning her prior employment.

These omissions and false statements convincingly reveal a pattern to conceal the assets in which the trustee might have an interest, with the clear intent to make the case appear to be a no-asset case; no other inference is reasonably possible.

Accordingly, the debtors' discharge must be denied under 11 U.S.C. § 727(a)(4)(A).

### F. *The Trustee's Claim Under 11 U.S.C. § 548(a)*

11 U.S.C. § 548(a) provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any

property remaining with the debtor was an unreasonably small capital; or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

The trustee's claim under this section is not stated with particularity. The Court can find no evidence of "any transfer of any interest of the debtor in property" that was made within one year before the date of the filing of the petition. Accordingly, this claim is dismissed.

### G. The Trustee's Claim Under The Michigan Uniform Fraudulent Conveyance Act

11 U.S.C. § 544(b) provides:

The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

The Michigan Uniform Fraudulent Conveyance Act, M.C.L.A. § 566.11 et seq., identifies several types of fraudulent conveyances: (1) a conveyance by an insolvent (M.C.L.A. § 566.14); (2) a conveyance without fair consideration (M.C.L.A. § 566.15); (3) a conveyance by a person about to incur debts (M.C.L.A. § 566.16); and (4) a conveyance made with intent to defraud (M.C.L.A. § 566.17).

As the debtors have noted, their ability to defend this claim has been hampered by the lack of particularity in the trustee's pleadings. Cf. Rule 9, Federal Rules of Civil Procedure. The Court's review of the claim has likewise been hampered.

Nevertheless, it is sufficient to note that there is evidence of only three conveyances which could conceivably be found fraudulent: (1) the Bidlofskys' sale of their home; (2) the Bidlofskys' payments to their creditors (including Murray Bidlofsky) from the proceeds of the sale; and (3) the transfer of the Lincoln automobile to Murray Bidlofsky. Given the trustee's pleadings and proofs, the Court must conclude that there is no clear and convincing evidence of any fraudulent conveyance under the Michigan Uniform Fraudulent Conveyance Act.

M.C.L.A. § 566.14, pertaining to conveyances by insolvents, does not appear to apply to any of these conveyances, if only because there is no clear evidence as to when the Bidlofskys became insolvent.

M.C.L.A. § 566.15, pertaining to conveyances without fair consideration, does not apply to any of these conveyances, because there is no evidence that any of the conveyances were made without fair consideration. In this regard, the Court notes that the evidence is equivocal on this issue of whatever the conveyance to Murray Bidlofsky was made for fair consideration. This same discussion applies also to M.C.L.A. § 566.16.

Finally, the Court must conclude that M.C.L.A. § 566.17, pertaining to conveyances made with fraudulent intent, likewise does not apply to any of the conveyances. The transfer of the Lincoln vehicle was already been found in state court to have been a fraudulent conveyance. The conveyance of the home cannot be set aside because the purchasers gave fair consideration and were unaware of the fraud that the Bidlofskys were perpetrating on their creditors at the time. Cf. M.C.L.A. § 566.-19. And finally, none of the payments to creditors at the time was made with the intent to defraud.

As noted earlier, the fraud in connection with the sale of the house was simply the Bidlofskys' representation that the creditors were receiving all of the proceeds. However, there was no apparent transfer or conveyance of the Bidlofskys' actual portion of the proceeds; at least there was no such conveyance that the Court can find fraudulent. Accordingly, the trustee's claims under the Michigan Uniform Fraudulent Conveyance Act must be dismissed.

### H. The Trustee's Objection To The Claim of Exemption

The trustee objects to the debtors' claim of exemption in the amount of $6600 in the

two Comerica savings accounts. (Plaintiff's Exhibits 37 and 38) The trustee contends that these funds are essentially the last remaining funds traceable to the sale of their home; that as such they are assets obtained or retained by fraud; and that assets obtained by fraud are not exemptable.

The Court concludes that this issue must be resolved pursuant to 11 U.S.C. § 522(g) which provides:

(g) Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if—

(1)(A) such transfer was not a voluntary transfer of such property by the debtor; and

(B) the debtor did not conceal such property; or

(2) the debtor could have avoided such transfer under subsection (f)(2) of this section.

As developed below, the funds in the two Comerica Bank accounts are plainly property of the estate which the bank was and is required to turn over to the trustee pursuant to 11 U.S.C. § 542. Thus, under § 522(g) it can be exempted by the debtors only if the debtors "did not conceal such property". In light of the Court's holding that the debtors did conceal this property, as noted above, the Court must sustain the trustee's objection to the debtors' claim of exemption in this property.

I. *The Trustee's Claim Against Comerica Under 11 U.S.C. § 542(a)*

(1) Pursuant to 11 U.S.C. § 542(a), the trustee seeks a judgment against Comerica for the amount on deposit in the two savings accounts on the date of filing, less the amount from these accounts that the Bidlofskys later repaid to the trustee. This section provides:

Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

Plainly, the funds on deposit at the bank were property that the trustee could "use, sell, or lease" under 11 U.S.C. § 363(b)(1), which allows the trustee to "use, sell or lease ... property of the estate." In turn, "property of the estate" is defined in 11 U.S.C. § 541(a)(1), which provides:

Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

It is equally plain that Comerica Bank has not delivered this property to the trustee. Accordingly, the Court concludes that the trustee is entitled to a judgment against Comerica Bank.

(2) The bank advances two arguments in defense of the trustee's claim.

(a) First, it argues that if the trustee had fulfilled his obligations under 11 U.S.C. § 704(1), which requires the trustee to "collect and reduce to money the property of the estate" in an expeditious manner, the trustee would have had the money before the Bidlofskys would have succeeded in their withdrawals. Specifically the bank argues that on or just after December 7, 1984, when the trustee was advised of the account as a result of the amendment to the schedules, he should have taken steps to "collect" the account, either by providing a turnover action or an order freezing the account. The bank argues that the letter sent by the trustee's attorney on February 1, 1984, requesting that the account be "frozen until litigation is resolved"[10] (Plaintiff's Exhibit 45, Defend-

---

**10.** The trustee and his attorney had sent two    earlier letters to the bank on this matter, dated

ant's Exhibit D) did not fulfill the trustee's duties. Thus the bank argues that the trustee and his attorney should be held responsible for the withdrawal, and not the bank.

█ The Court must agree that a trustee is under an obligation to collect property of the estate expeditiously. 11 U.S.C. § 704(1). The Court must further agree that in the case of a bank account that is clearly property of the estate, a trustee breaches that obligation when for nearly two months after notice of the account, all the trustee does is send a letter requesting a "freeze"; plainly, 11 U.S.C. § 704 requires the trustee to "collect" the property, not request that others hold it for him.

█ Nevertheless, the Court must reject the bank's conclusion that the trustee's breach of his obligations relieves it of any liability. Clearly the Sections 704 and 542 create separate and distinct obligations; just as the trustee had a duty to collect these funds from the bank under Section 704, the bank had and still has a duty to deliver the funds to the trustee under Section 542. In this regard, the Court notes that the duty imposed upon the bank under Section 542 is not contingent upon a request by the trustee, or upon any resolution of any exemption issue, or upon the issuance of a turnover order by the Court, or upon any other condition precedent. The bank's duty to deliver the funds to the trustee, especially where as here it had knowledge of the bankruptcy, is absolute. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); *NLT Computer Services Corp. v. Capital Computer Systems, Inc.*, 755 F.2d 1253 (6th Cir.1985); *In re Hoffman*, 51 B.R. 42 (Bankr.E.D.Ark.1985); *In re Archer*, 34 B.R. 28 (Bankr.N.D.Tex.1983); *In re Cusanno*, 17 B.R. 879 (Bankr.E.D.Pa.1982); 4 *Collier on Bankruptcy*, ¶ 541.11 and

542.1 (15th ed. 1984). The trustee's breach of duty is irrelevant to the bank's duty.

The bank has yet to fulfill that duty. Accordingly, the trustee is entitled to a judgment.

(b) The second argument advanced by the bank in defense of the trustee's claim is that the trustee ought to pursue these funds against the debtors, or against the individuals to whom the debtors paid the money. The Court must reject this argument as a defense, essentially for the reasons stated above—the bank has yet to fulfill its duty to deliver the funds to the trustee pursuant to Section 542.

(3) The amount of the judgment is clear from the evidence. Plaintiff's Exhibit 37 and 38 establish that a total of $6321.16 was on deposit in these accounts on November 15, 1984. Plaintiff's Exhibit 1 establishes that the Bidlofskys repaid $1180 of this. Accordingly, the Court will enter a judgment against Comerica in the amount of $5141.16.[11]

## J. *The Trustee's Fraud Claim Against the Bidlofskys and Bockneck*

█ In Count I, as "corrected" in Count VI of the second amended complaint, the trustee seeks, *inter alia*, a judgment against the Bidlofskys for fraud in connection with the representations that they and their attorney made in connection with the closing on the sale of their home on September 6, 1983, to the effect that they were receiving none of the proceeds. In Count VII of the second amended complaint, the attorney Bernard Bockneck is added as a party defendant to this claim. Specifically, the trustee seeks $50,943.00 in damages, the amount the Bidlofskys received from the closing.

Bockneck was served with the second amended complaint and a summons on May 31, 1985. However he has never filed an answer or defended this action, and his default has been entered.

---

January 8 and 15, 1985, but neither requested as much as the February 1, 1984 letter. See p. 17 above.

11. Because the Bidlofskys did not withdraw all the funds on deposit, some funds apparently remain in the accounts. Comerica is of course free to apply those deposited funds in payment of this judgment under Section 542.

For the reasons stated above, the Court concludes from the proofs that in connection with the sale of the home, the Bidlofskys and Bockneck did knowingly and intentionally falsely represent to the Bidlofskys' creditors that the Bidlofskys would receive nothing from the sale and that all of the proceeds would go to creditors, that the Bidlofskys and Bockneck intended to have the creditors rely on these false representations, and that the creditors did in fact rely on these false representations.

The evidence shows that the debtors received $50,943 from the closing, and that they paid one creditor, Murray Bidlofsky, $12,500 from this. Moreover, the Bidlofskys have repaid $1180 of this to the trustee. Thus the creditors have actually been defrauded in the net amount of $37,063. Thus the Court will enter a judgment in favor of the trustee against the Bidlofskys and Bockneck in the amount of $37,063. However, any amount recovered from Comerica Bank should be credited to this judgment, in order to prevent a possible double recovery.

### K. *Comerica's Cross-Claim Against the Debtors*

■ In its cross-complaint, Comerica seeks a judgment against the Bidlofskys to the extent of any judgment that the trustee obtains against it, and a judgment that the debt not dischargeable in bankruptcy due to fraud.

The debtors respond that the funds were and are exempt and therefore should not be repaid to the trustee.

Because the Court has already sustained the trustee's objection to the debtors' claim of exemption, the Court must reject the debtors' argument.

■ Accordingly, the Court concludes that Comerica is entitled to the judgment it seeks.[12]

Appropriate judgments are entered herewith.

12. However, the debtors fraud will not be the basis of holding the debt not discharged. Rather, it is not discharged simply because it is a post-petition debt. 11 U.S.C. §§ 523 and 727.