**In re Jerry L. SUMPTER and Santina M. Sumpter, Debtors.**

**UNITED STATES of America, Plaintiff,**

**v.**

**Jerry L. SUMPTER and Santina M. Sumpter, Defendants.**

**Bankruptcy No. 89–09791.**
**Adv. No. 89–9090.**

United States Bankruptcy Court, E.D. Michigan, N.D.

July 9, 1991.

As Amended Sept. 3, 1991.

692

Thomas J. Clark, Washington, D.C., for plaintiff.

Donald F. Cadotte, Birmingham, Mich., for defendants.

## CORRECTED MEMORANDUM OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARTHUR J. SPECTOR, Bankruptcy Judge.

The United States of America (the government) sued for an order denying Jerry L. Sumpter (Mr. Sumpter) and Santina M. Sumpter (Mrs. Sumpter) their bankruptcy discharge or, alternatively, for an order determining that their debt to the Internal Revenue Service (IRS) is excepted from the discharge. The following constitute my findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### Statement of the Case

On September 27, 1989, the Sumpters filed their voluntary petition for relief under chapter 7 of the Bankruptcy Code. They scheduled a debt to the IRS in the total amount of $251,255.68 for unpaid income taxes, interest and penalties for the years 1981, 1982, 1984 and 1985. On December 26, 1989, the government filed a four-count complaint against the Sumpters. In Count I, the government alleged that the Sumpters should be denied a discharge

pursuant to § 727(a)(4)[1] because of numerous false oaths on their bankruptcy schedules and statement of financial affairs. Count III[2] requested denial of discharge because the Sumpters allegedly failed to satisfactorily explain the loss of assets or deficiency of assets to meet their liabilities. § 727(a)(5). Count IV alleged that the debt due the IRS is not dischargeable because the Sumpters had willfully attempted to evade or defeat the tax. § 523(a)(1)(C). On December 6, 1990, the Court granted the government's motion for summary judgment as against Mr. Sumpter only on the § 523 count.[3] Because the government thereby received all the relief that it sought with respect to Mr. Sumpter, the various § 727 counts against him were not tried.[4] The trial of this action thus involved only the allegations made against Mrs. Sumpter.

### Preliminary Conclusions of Law

1. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

2. This is a core proceeding. 28 U.S.C. § 157(b)(2)(I), (J).

3. The government has the burden of proving the elements of the different causes of action pled. Bankruptcy Rule 4005 (§ 727 counts); *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (§ 523 count).

### Standard of Proof on the § 727 Counts

■ In *Grogan, supra,* the Supreme Court held that a party seeking an exception to the bankruptcy discharge of the debtor must establish the elements for such an exception by a preponderance of the evidence. With respect to an objection to the general discharge under § 727, however, there remains a split of authority among the courts as to whether the appropriate standard is a preponderance of the

evidence or the higher standard of clear and convincing evidence. *Compare Farmers Co-op Assoc. v. Strunk,* 671 F.2d 391 (10th Cir.1982); *In re Shults,* 28 B.R. 395, 10 B.C.D. 405 (9th Cir.B.A.P.1983); *In re Stowell,* 113 B.R. 322 (Bankr.W.D.Tex. 1990); *In re Weber,* 99 B.R. 1001, 19 B.C.D. 205 (Bankr.D.Utah 1989); *In re Parker,* 85 B.R. 384, 17 B.C.D. 570 (Bankr.E.D.Va. 1988), *aff'd,* 879 F.2d 863 (1989); *In re Clausen,* 44 B.R. 41, 45, 12 B.C.D. 584 (Bankr.D.Minn.1984); *In re LaBonte,* 13 B.R. 887, 5 C.B.C.2d 181, 188 (Bankr. D.Kan.1981) (preponderance of the evidence); *with In re Bogstad,* 779 F.2d 370 (7th Cir.1985); *First Federated Life Ins. Co. v. Martin,* 698 F.2d 883 (7th Cir.1983); *Camacho v. Martin,* 88 B.R. 319 (D.Colo. 1988); *In re Overmyer,* 121 B.R. 272 (Bankr.S.D.N.Y.1990); *In re Mayo,* 94 B.R. 315, 18 B.C.D. 931, 20 C.B.C.2d 641 (Bankr. D.Vt.1988); *In re Booth,* 70 B.R. 391 (Bankr.D.Colo.1987); *In re Lineberry,* 55 B.R. 510 (Bankr.W.D.Ky.1985); *In re Cohen,* 47 B.R. 871, 874, 12 B.C.D. 1210 (Bankr.S.D.Fla.1985) (clear and convincing evidence). The logical question is whether the rationale of *Grogan* should be extended to § 727(a) proceedings. For the reasons discussed below, I think that it should.

In holding that § 523(a) actions should be tried under the preponderance standard, the Supreme Court relied on several theories, each of which would call for the same conclusion in the context of § 727(a). First, the Court noted that neither § 523 nor its legislative history specified the appropriate evidentiary standard. The Court characterized this "silence" as being "inconsistent with the view that Congress intended to require a special, heightened standard of proof." —— U.S. at ——, 111 S.Ct. at 659, 112 L.Ed.2d at 764. As with § 523(a), the Bankruptcy Code itself contains no provision regarding the appropri-

---

**1.** Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 et seq.

**2.** Count II of the complaint, alleging a violation of § 727(a)(2), was dismissed on December 6, 1990, pursuant to the Sumpters' motion for summary judgment.

**3.** This motion was denied as against Mrs. Sumpter.

**4.** The government reserved the right to proceed against Mr. Sumpter on the remaining counts, however, should the Court's entry of summary judgment be reversed on appeal.

ate standard of proof in connection with denial of a general discharge under § 727(a). Applying the Supreme Court's rationale in *Grogan*, this statutory silence suggests that a preponderance standard should govern § 727(a) actions.

In contrast to § 523(a), however, the legislative history pertaining to § 727(a) is not silent. The House and Senate Reports accompanying § 727(a) state as follows:

> The fourth ground for denial of discharge is the commission of a bankruptcy crime, *though the standard of proof is preponderance of the evidence* rather than proof beyond a reasonable doubt. These crimes include the making of a false oath or account, the use or presentation of a false claim, the giving or receiving of money for acting or forbearing to act, and the withholding from an officer of the estate entitled to possession of books and records relating to the debtor's financial affairs.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 384 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 98–99 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5884, 5885, 6340 (emphasis added). *Grogan* cited a portion of the foregoing passage in support of its observation that "Congress chose the preponderance standard to govern determinations under 11 U.S.C. § 724(a)(4)." —— U.S. at ——, 111 S.Ct. at 660, 112 L.Ed.2d at 766.

Given the fact that the conduct described in § 727(a)(4) constitutes a crime, *see* L. King, 4 *Collier on Bankruptcy*, ¶ 727.04[1] (15th ed. 1990), this passage from the legislative history was presumably designed to remove any doubt with regard to the applicable standard of proof in a § 727(a)(4) proceeding. Since the lower preponderance standard is to be applied even where criminal conduct is alleged, it is logical to assume that Congress did not contemplate a higher standard in cases involving other kinds of conduct enumerated under § 727(a) which may not be defined as criminal under federal or state law, and which in any event are no more unsavory than the conduct described in § 727(a)(4). Thus, the legislative history supports the conclusion that a preponderance standard applies under § 727(a). *Cf. In re Cook*, 126 B.R. 261, 265 (Bankr.E.D.Tex.1991).

A second ground advanced by *Grogan* is that the right to discharge of a particular debt challenged under § 523(a) is not "sufficient to require a heightened standard of proof." —— U.S. at ——, 111 S.Ct. at 659, 112 L.Ed.2d at 764. Although denial of a general discharge under § 727(a) would often have a much greater economic impact on the debtor than would the granting of an exception to discharge under § 523(a), *Grogan* gives no hint that such a distinction is significant. Indeed, *Grogan* relied on *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), which held that a right to obtain a general discharge of debts in bankruptcy did not constitute a "fundamental interest." *Id.* at 445, 93 S.Ct. at 637. Moreover, the right to discharge of all debts and the right to discharge of a particular debt are qualitatively indistinguishable; actions under § 523(a) and § 727(a) are essentially monetary in nature, and there is accordingly no principled basis for requiring an elevated standard of proof where denial of a general discharge is sought. *See In re Watkins*, 90 B.R. 848, 856, 18 B.C.D. 311, 19 C.B.C.2d 678 (Bankr.E.D.Mich.1988) (suggesting that the preponderance standard should generally govern where the defendant's "economic rights," rather than his "liberty rights," are at stake); *see also In re Bidlofsky*, 57 B.R. 883, 893 (Bankr.E.D.Mich. 1985) (implicitly assuming that the distinction between denying a discharge and granting an exception to discharge is irrelevant for purposes of determining the appropriate evidentiary standard).

The Court in *Grogan* also observed that Congress evidently concluded that the creditors' interests in recovering full payment of debts in these categories [i.e., those enumerated under § 523(a) ] outweighed the debtors' interest in a complete fresh start. We think it unlikely that Congress, in fashioning the standard of proof that governs the applicability of these provisions, would have favored the interest in giving perpetrators of fraud a

fresh start over the interest in protecting victims of fraud.

—— U.S. at ——, 111 S.Ct. at 659, 112 L.Ed.2d at 765. This skepticism regarding Congress' enthusiasm for granting a fresh start to dishonest debtors would of course be equally applicable in the context of § 727(a).[5] *Cf. Cook,* 126 B.R. at 266 (opining that *Grogan's* reasoning "may be even more appropriate in the context of § 727" because "the majority of § 727 causes of action deal with upholding the integrity of the bankruptcy process rather than serving as a protective device for wronged creditors").

Using the "holistic" approach of statutory interpretation, *Grogan* also reasoned that, "[b]ecause it seems clear that a preponderance of the evidence is sufficient to establish the nondischargeability of some of the types of claims covered by § 523(a) [footnote omitted], it is fair to infer that Congress intended the ordinary preponderance standard to govern the applicability of all the discharge exceptions." —— U.S. at ——, 111 S.Ct. at 660, 112 L.Ed.2d at 765. As previously noted, actions under § 727(a)(4) are to be tried under the preponderance standard. Moreover, § 727(a) includes various kinds of conduct which are not in the nature of fraud,[6] and thus would not appear to justify a more stringent evidentiary standard. The same rule of statutory construction utilized in *Grogan* would therefore suggest that the preponderance standard should likewise apply to all paragraphs under § 727(a).

In further support of its holding, the Court in *Grogan* noted that Congress "has chosen the preponderance standard when it has created substantive causes of action for fraud." *Id.* at ——, 111 S.Ct. at 660, 112 L.Ed.2d at 766. The Court cited Congress' longstanding policy favoring a broad range of exceptions to discharge based on the debtor's fraud. *Id.* at ——, 111 S.Ct. at 660, 112 L.Ed.2d at 767. Once again, this consideration suggests that the wrongful conduct enumerated under § 727(a) need only be proven by a preponderance of the evidence.

For these reasons, I believe that the rationale of *Grogan* applies with equal force in § 727(a) actions, and conclude that the standard of proof by which the government must establish the elements of its cause of action under § 727(a) is by a fair preponderance of the evidence. *See Cook,* 126 B.R. at 265; *In re Davis,* 124 B.R. 831, 835 (Bankr.D.Kan.1991); *In re Goldstein,* 123 B.R. 514, 522 n. 15 (Bankr.E.D.Pa.1991).

### *Count I Section 727(a)(4)*

Section 727(a)(4)(A) states in pertinent part that "[t]he court shall grant the debtor a discharge, unless—(4) the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account." A party objecting to discharge under § 727(a)(4) "must establish that the debtor knowingly made a false statement under oath with the intent to defraud his creditors regarding a matter material to the administration of his estate." *In re Hussan,* 56 B.R. 288, 290, 14 B.C.D. 45 (Bankr.E.D.Mich.1985).

In order to prove fraudulent intent, a number of cases have stated that the objecting party need only show that the debtor acted with reckless disregard for the truth of the statement in question. *In re Tully,* 818 F.2d 106, 112 (1st Cir.1987); *In re Martin,* 124 B.R. 542, 547 (Bankr. N.D.Ind.1991); *In re Just,* 97 B.R. 98, 100 (Bankr.M.D.Fla.1989); *In re Dias,* 95 B.R. 419, 424–25 (Bankr.N.D.Tex.1988) (collecting cases); *In re Diodati,* 9 B.R. 804, 808 (Bankr.D.Mass.1981). Recklessness has been associated with bad or evil intentions in non-bankruptcy contexts as well. *See, e.g., New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964) (A defamatory statement "made with reckless disregard of whether it was false or not" constitutes

---

**5.** Although not all of the grounds for denial of discharge under § 727(a) necessarily involve inherently "wrongful" conduct, *see infra* n. 6, the same is true of § 523(a). *See* 11 U.S.C. § 523(a)(1)(A), (3)(A), (5), (7), (8) and (10).

**6.** *See* 11 U.S.C. § 727(a)(1), (8), (9) and (10).

"actual malice"); *Frank Irey, Jr., Inc. v. OSHRC*, 519 F.2d 1200, 1207 (3d Cir.1974), *aff'd sub nom. Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977) ("Willfulness connotes defiance or such reckless disregard of consequences as to be equivalent to a knowing, conscious, and deliberate flaunting of the [Occupational Safety and Health] Act.")

The problem with equating recklessness with fraudulent intent, however, is that it can cause one to lose sight of the fact that recklessness is essentially a species of negligence, *see Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir.1979) (defining recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care"); *In re Woolner*, 109 B.R. 250, 253 n. 5 (Bankr. E.D.Mich.1990), and thus does not necessarily imply fraudulent intent or, for that matter, any other kind of *mens rea* on the part of the actor. *Cf. Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986) ("Mere reckless disregard for the truth or falsity of the statement, which can support a libel verdict, is not ... willful and malicious....").

Indeed, a debtor does not necessarily act with fraudulent intent even if he *knowingly* makes a false oath, and § 727(a)(4)(A), by requiring both knowledge *and* the intent to defraud, implicitly acknowledges that fact. It would certainly be anomalous to hold that a finding of reckless disregard on the part of a debtor for the accuracy of her schedules obviates the need to establish fraudulent intent, even though the Code permits no such "short cut" with respect to a debtor who signs schedules containing information which she knows to be false. I therefore disagree with those cases suggesting that reckless disregard is equivalent to fraudulent intent.

On the other hand, a finding that a debtor acted with fraudulent intent logically implies a finding that the debtor knew the statement in question was false when she made it. The cited cases therefore support the proposition that reckless disregard as to the truth of a statement is tantamount to knowledge of its falsity for purposes of § 727(a)(4)(A), and to that extent I concur with those cases. *Cf. J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474 (6th Cir.1991) (no claim of error raised with respect to jury instruction that the elements of fraud include a finding that "the representation was [known to be] false at the time it was made, or that it was made recklessly without any knowledge of its truth"); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1305 (2d Cir.1973) ("reckless disregard for the truth" may constitute "the equivalent of knowledge" for purposes of SEC Rule 10b–5).

■ The government alleged that Mrs. Sumpter should be denied a discharge under this section because she falsely stated on Schedule B–1 that the value of her home was $96,000 and on Schedule B–2 that the value of her household goods, supplies and furnishings was $500. In general, a statement regarding the value of property reflects nothing more than the declarant's personal opinion and, as such, would not support a finding of fraud. *In re Bowen*, 58 F.Supp. 286, 295 (E.D.Pa.1944); *In re Pascucci*, 90 B.R. 438, 444, 17 B.C.D. 1212 (Bankr.C.D.Cal.1988); *Wisconsin Engineering v. Fisher*, 466 N.E.2d 745, 756 (Ind.App.1984). But this rule presupposes that such a statement does in fact represent the declarant's opinion. If Mrs. Sumpter did not genuinely believe that the property in question was worth what she claimed it was worth, then she misrepresented her opinion. Since a critical issue in the context of a § 727(a)(4)(A) action is the debtor's honesty, *see Tully*, 818 F.2d at 110; *In re Krich*, 97 B.R. 919, 923–24 (Bankr.N.D.Ill.1988), such a misrepresentation could constitute grounds for denial of her discharge, even if the estimate of value which purports to be her opinion should prove to be accurate.

■ To establish the falsity of the statement about the value of the home, and that Mrs. Sumpter did not truly believe the low value stated on Schedule B–1, the government showed that on November 28, 1989, the Sumpters signed and subsequently filed a reaffirmation agreement with Great Lakes Bancorp (Exhibit 24), wherein

they agreed to repay the $133,066.75 outstanding balance due on their home mortgage. In the agreement, the Sumpters stated: "Debtors are of the opinion that the value of said collateral to them is equal to the principal balance herein reaffirmed."

With respect to the household items, the government showed that on August 16, 1989, only 42 days before they filed bankruptcy, the Sumpters submitted to the IRS a signed Form 433A (Collection Information Statement for Individuals, Exhibit 3), in connection with their offer in compromise. This form stated that the "current market value" of the Sumpters' "personal property furniture" was $13,000.

Although not specifically alleged in the complaint, the proofs disclosed other apparent misstatements by Mrs. Sumpter. Schedule B-2(f), for example, did not include a 1986 Subaru automobile which the Sumpters listed as their property in Exhibit 3 and in Exhibit 4 (Statement of Financial Condition and Other Information—Form 433, signed and submitted to the IRS on May 6, 1988, also in connection with the Sumpters' offer in compromise). The car was valued in Exhibit 3 at $3,000 and in Exhibit 4 at $3,500.

The proofs also revealed an apparent misstatement in either Schedule A-2 or the Sumpters' statement of financial affairs. On Exhibit 3, the Sumpters told the IRS that their household goods were encumbered by a lien in favor of the J.L. & Shaundra Sumpter Trust, a trust the Sumpters set up for their children on May 1, 1979. (Exhibit 5). This lien was not disclosed in Schedule A-2, nor was any debt listed as owed to the trust. If the Sumpters paid off the encumbrance after August 16, 1989 (the date Exhibit 3 was executed), but before they filed bankruptcy on September 27, 1989, then their negative response to question 11(a) in the statement of financial affairs [7] is inaccurate.

In response to these allegations, Mrs. Sumpter testified that she never read the bankruptcy schedules or the statement of financial affairs before signing them. According to her testimony, Mrs. Sumpter grew up in a family and society in which the wife generally played a passive role, particularly with respect to financial and business matters. Consistent with this tradition and cultural orientation, Mrs. Sumpter testified that she signed the documents at the direction of her husband, and did not review them to verify their accuracy.

Although Mrs. Sumpter stated that she did not read her schedules before she signed them, she did concede that she read the preprinted language above her signature declaring "under penalty of perjury" that she had read them "and that they are true and correct to the best of [her] knowledge, information, and belief." The next issue, then, is whether her false oath—i.e., that she had read the documents when in fact she had not—is an independent basis for denial of discharge under § 727(a)(4)(A).

In light of Mrs. Sumpter's candid testimony, it is obvious that she knowingly made a false statement when she swore that she had read the documents before signing them. Although a closer call, I also believe that the question of whether a debtor has in fact read her bankruptcy schedules is "material" for purposes of § 727(a)(4)(A). If Mrs. Sumpter had signed the documents truthfully—such as by writing in a disclaimer or by striking all or portions of the declaration—the trustee and creditors would have been put on notice that the reliability of the information contained in the documents was suspect, and as a result they might have engaged in a higher level of scrutiny with regard to the debtor's financial affairs. *Cf. In re Mascolo*, 505 F.2d 274, 277–78 (1st Cir. 1974) (False statements "are material if pertinent to the discovery of assets.... The successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure."); *In re Montgomery*, 86 B.R. 948, 957 (Bankr.N.D.Ind.1988) ("The mate-

---

7. That question asks the debtor to identify payments made on loans or other debts in the year prior to the filing of the bankruptcy petition.

The Sumpters' response was "Regular payments in ordinary course of business."

riality of the false oath does not require that the creditors were prejudiced by the false statement, but rather, the question of materiality depends on whether the false oath was pertinent to the discovery of assets or past transactions."). I therefore regard Mrs. Sumpter's false oath that she had read the relevant documents as a material misrepresentation.

The remaining element which must be satisfied under § 727(a)(4)(A) is whether this false oath was made fraudulently. It is well-established that the requisite fraudulent intent "may be discovered by inference from the facts." 4 *Collier on Bankruptcy,* ¶ 727.04. But the government has utterly failed to point to any facts tending to show that this false oath was made with fraudulent intent. Accordingly, I conclude that the government did not prove that Mrs. Sumpter's misrepresentation that she had read the schedules is actionable under § 727(a)(4).

■ Turning to the other statements identified by the government as false, the first issue is whether, when she filed her petition and ancillary documents, Mrs. Sumpter believed: (1) that the home was worth more than $96,000; (2) that the household furnishings, etc. were worth more than $500; (3) that she owned a Subaru; and (4) that there was a lien on the furnishings, etc. or, alternatively, that the lien was released prior to the bankruptcy. The government, as plaintiff, had the burden of proving that Mrs. Sumpter falsely stated her belief.

Mrs. Sumpter testified that her attorney advised that "value," for bankruptcy purposes, meant what other people would pay for the property if it were for sale. She stated that she had no idea when she filed bankruptcy what her home or her furnishings were "worth," insofar as that term meant "fair market value," or what others would pay her for them if they were for sale. She also testified that now that she understands the term "S.E.V." (the "state equalized value" of the home), she believes her home was "worth" $96,000 when she filed bankruptcy. Under Michigan law, the S.E.V. cannot exceed one-half of what the tax assessor believes is the fair market value of the property. Const. 1963, art. 9, § 3.[8] Since the S.E.V. on her home was $48,000 when the bankruptcy was filed (Exhibit A–2), $96,000 was written down on Schedule B–1 as its value.[9]

Mrs. Sumpter explained the reaffirmation's valuation by pointing out that the home was worth the amount of the debt, $133,066.75, to her husband and her because it is their home. That doesn't mean, she explained, that it was her opinion that its fair market value is $133,066.75, as she does not know what a reasonable purchaser would offer for the home. Indeed, Exhibit 24, the reaffirmation, did state that it was the Sumpters' opinion that the value of the property "to them" was equal to the principal balance being reaffirmed.

The government did not even attempt to prove that the home or the furnishings were worth any more than what the schedules indicated. The only evidence relied upon by the government to prove falsity is the apparently contradictory statements contained in Exhibits 3, 4 and 24. However, Exhibits 3 and 4 both stated that the Sumpters believed the "current market value" of their home, based on "double equalized value," was $96,000, although Exhibit 4 also disclosed that the home "cost" $139,-308.

The valuation standards used in Exhibits 3 and 4 may vary from those applicable to bankruptcy cases, and so the apparently contradictory statements may in fact be

---

8. The constitution speaks in terms of the property's "true cash value," rather than its "fair market value." As a practical matter, the terms are interchangeable. *See* Mich.Comp.Laws § 211.27(1) (defining cash value as "the usual selling price ... that could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale").

9. During the pendency of the case, the tax assessment on the house was raised to $55,000 (Exhibit A–1), and the Sumpters subsequently amended their Schedule B–1 to show value at $110,000 instead of the original $96,000.

explainable. Moreover, I believe Mrs. Sumpter's explanation that all three exhibits were completed solely by her husband. It is also entirely plausible that the statements made on Exhibits 3 and 4 relative to the household furnishings' value and the alleged lien on them in favor of the trust were false and that the statements in the bankruptcy documents were true. *See infra* p. 704. Thus I conclude that the government failed to prove by a preponderance of the evidence either that the schedules' valuation of the home or the furnishings were false or, assuming Mrs. Sumpter read the schedules before she signed them and knew the values she was attesting to, that she believed that the valuations were untrue.[10]

■ With respect to the Subaru, Mrs. Sumpter testified that, although she had been the primary driver until it was disposed of in December, 1990, the car was never her property. She didn't know if it was titled in her husband's name or in the name of his professional corporation, but was emphatic that the title was not in her name. The government offered no evidence to show that this was untrue or that the Subaru should have been listed on her asset schedules. Accordingly, the Subaru's omission from Schedule B–2 is not actionable.

■ Since she professed no knowledge about transactions with her children's trust, Mrs. Sumpter had no explanation as to why the trust was listed on Exhibit 3 as having a lien on the furnishings or whether the indebtedness which it secured had ever

been repaid. In any event, the government failed to prove that by omitting the trust as a creditor from the schedules, Mrs. Sumpter made a false statement, or that Mrs. Sumpter's negative answer to question 11 of the statement of financial affairs was untrue.

To summarize, the only statement made by Mrs. Sumpter in connection with this case that the government proved was false concerned whether she had actually read her schedules before signing them, and the government failed to establish that that statement was fraudulent. The government did not prove that any of Mrs. Sumpter's other allegedly false statements were untrue.[11] Even if I were to assume the statements were untrue, the government also failed to prove either that Mrs. Sumpter knew that they were untrue, or that she acted with reckless disregard for their accuracy.

### Section 727(a)(5)

■ The government also requested denial of discharge because Mrs. Sumpter "failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." § 727(a)(5). Its theory was that just prior to filing bankruptcy the Sumpters owned a Subaru and $13,000 of household furnishings, but when they filed bankruptcy they had no Subaru and only $500 worth of furnishings. Mrs. Sumpter, it argued, failed to explain satisfactorily the loss of these assets.[12] For the reasons stated in

---

**10.** Mrs. Sumpter also argued that, even if the home were worth $133,066.75 as per Exhibit 24, its misvaluation in Schedule B–1 was not material because there would still be no equity for the estate due to Great Lakes Bancorp's mortgage lien in that amount. *See, e.g., In re Waddle,* 29 B.R. 100, 103 (Bankr.W.D.Ky.1983); *In re Harris,* 8 B.R. 88, 7 B.C.D. 437 (Bankr. M.D.Tenn.1980). I need not address that argument here, although I note that many courts have rejected it. *See, e.g., In re Calder,* 907 F.2d 953, 955 (10th Cir.1990); *In re Chalik,* 748 F.2d 616, 618 (11th Cir.1984); *In re Van Den Heuvel,* 125 B.R. 846, 851 (Bankr.S.D.Fla.1991); *In re Arcuri,* 116 B.R. 873, 881 (Bankr.S.D.N.Y.1990).

**11.** Because the government failed to establish the falsity of these statements, I need not ad-

dress the question of whether Mrs. Sumpter's failure to read the schedules constitutes a valid defense. I note, however, that there are cases going both ways on this issue. *Compare In re Ward,* 92 B.R. 644, 647, 18 B.C.D. 634 (Bankr. W.D.Pa.1988); *In re Glickman,* 64 B.R. 616, 617 (Bankr.S.D.Fla.1986); *In re Gonday,* 27 B.R. 428, 432 (Bankr.M.D.La.1983) (defense successfully invoked); *with In re Johnson,* 82 B.R. 801, 806–07 (Bankr.E.D.N.C.1988); *In re Mazzola,* 4 B.R. 179, 183, 2 C.B.C.2d 242 (Bankr.D.Mass. 1980) (defense rejected).

**12.** A better argument, not raised by the government, was that Mrs. Sumpter had not properly accounted for the $90,000 allegedly borrowed

**700**

the discussion about § 727(a)(4), I conclude that Mrs. Sumpter did satisfactorily explain the discrepancies noted.

### Section 727(a)(2)

▆▆▆▆ The government's principal § 727 argument is under § 727(a)(2). That section states:

> The court shall grant the debtor a discharge, unless—
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
> (A) property of the debtor, within one year before the date of the filing of the petition; or
> (B) property of the estate, after the date of the filing of the petition. . . .

§ 727(a)(2). This section is designed "to prevent the discharge of a debtor who attempts to avert collection of his debts by concealing or otherwise disposing of assets." In re Kessler, 51 B.R. 895, 898 (Bankr.D.Kan.1985).

The parties stipulated that the Sumpters conveyed six parcels of real property to their children's trust on April 23, 1988,[13] and that the conveyances were all duly recorded within days thereafter. Since the bankruptcy case was filed more than one year after the transfers were made, the government tried to circumvent the one-year cut-off contained in the statute by arguing "continuing concealment." This theory, which has fairly widespread acceptance, see In re Olivier, 819 F.2d 550 (5th Cir.1987); In re Kauffman, 675 F.2d 127 (7th Cir.1981); In re Hodge, 92 B.R. 919 (Bankr.D.Kan.1988); Bidlofsky, 57 B.R. at 894; In re Hazen, 37 B.R. 329, 332 (Bankr.

M.D.Fla.1983); 4 Collier on Bankruptcy, ¶ 727.02[2] (15th ed. 1991), holds that if one appears to have transferred an asset, yet keeps some hidden right to possess or control it, then she has concealed the asset, or an interest in it, each day that the concealment continues. If this theory is accepted, the fact that the properties in question were transferred more than one year before the filing of the petition is not pertinent, as the concealment could conceivably last until or after the date of filing.

The continuing concealment theory is most commonly applied when the debtor continues to use the asset directly (e.g. Olivier, Kauffman) or has transferred the asset to a company or a trust over which the debtor exerts such control as to warrant a determination that, in essence, the entity is a sham (e.g. Hodge, Hazen). In the latter type of case, liability under § 727(a)(2) stems from the reasoning that the debtor owns an interest in the sham entity, which itself was concealed from creditors. The government contended that by placing the properties into the trust, the Sumpters "concealed" their retained interest in them and that that concealment continues through today.

The government retains the burden of proof to establish the exception; it is not for the defendant to disprove the factors which have led courts to apply the continuing concealment theory. See In re Serafini, 113 B.R. 692, 694 (D.Colo.1990); In re Hooper, 39 B.R. 324, 327, 11 B.C.D. 1131 (Bankr.N.D.Ohio 1984); In re Chambers, 36 B.R. 791, 793–94 (Bankr.W.D.Ky.1984); In re Ries, 22 B.R. 343, 345–46 (Bankr. W.D.Wis.1982). In contrast to Kauffman, where the evidence established that the debtors continued to possess the transferred property, pay the mortgages and tax payments, and to claim the applicable tax deductions therefor, there is no evidence

by the Sumpters in January, 1988. See infra n. 16.

13. Based on the evidence produced at trial, I believe that the properties were actually transferred on April 21, 1988. Although I am free to reject any stipulation which I conclude is legally or factually incorrect, Universal Camera Corp. v. United States, 340 U.S. 474, 497, 71 S.Ct. 456,

469, 95 L.Ed. 456 (1951); Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 37 S.Ct. 287, 61 L.Ed. 722 (1917), the apparent error will have no impact on the outcome of this case. I will therefore assume that the transfers occurred on April 23, and forego a discussion of the evidence suggesting that they took place two days earlier.

that Mrs. Sumpter continued to enjoy the benefits or shoulder the burdens of owning the properties after they were transferred to the trust. The Sumpters' Form 1040 individual income tax return for 1988 (Exhibit 23a) does not show that the Sumpters claimed the income these properties generated nor the expenses a property owner would have incurred.

This is some evidence, therefore, that Mrs. Sumpter did not conceal a hidden retained interest in the properties. Since the government did not call the trustee or the former trustees as witnesses, I do not know the extent of Mrs. Sumpter's actual influence over the trustees' judgment. Under these circumstances, I conclude that the continuing concealment exception to the one-year limitation cannot be invoked here. *Cf. Serafini*, 113 B.R. at 695; *Hooper*, 39 B.R. at 327. Because the government was unable to establish one of the elements of the cause of action, I may not deny Mrs. Sumpter a discharge on account of § 727(a)(2).

### *Section 523(a)(1)*

 Finally, the government claimed that Mrs. Sumpter should not be allowed to discharge her obligation to the IRS because the debt is for a tax which "the debtor ... willfully attempted in any manner to evade or defeat." § 523(a)(1)(C). According to the government, Mrs. Sumpter attempted to evade or defeat the tax by fraudulently conveying real estate to her children's trust before the IRS could levy on the property. Relying on *In re Gathwright*, 102 B.R. 211 (Bankr.D.Or.1989), Mrs. Sumpter argued that even allegedly fraudulent transfers intended to thwart the government's collection actions do not constitute an attempt to "evade or defeat" the tax. When I granted the government's motion for summary judgment against Mr. Sumpter, I rejected that argument, relying on the well-reasoned opinion in *In re Jones*, 116 B.R. 810 (Bankr.D.Kan.1990). I reject it now as well.

In attempting to establish a fraudulent conveyance, the government relied heavily on the traditional "badges of fraud" to raise an inference that Mrs. Sumpter had the intent to defraud the IRS when she participated in the series of transfers of properties to her children's trust. The government asserted that the evidence established the presence of these badges of fraud: (1) a transfer made to a member of the family; (2) a transfer made at a time when a large liability was fixed, about to become fixed, or about to be collected; (3) a transfer for little or no consideration; (4) a transfer made when the debtor was insolvent or which rendered the debtor insolvent; (5) a transfer in which the debtor retained concealed control over the asset; and (6) the debtor engaged in other questionable practices during the same time period. *See In re Erdman*, 96 B.R. 978, 985 (Bankr.D.N.D.1988); *In re Peery*, 40 B.R. 811, 815–816, 12 B.C.D. 31 (Bankr. M.D.Tenn.1984); *In re Rubin*, 12 B.R. 436, 442 (Bankr.S.D.N.Y.1981); *Farrell v. Paulus*, 309 Mich. 441, 450, 15 N.W.2d 700 (1944); *Bentley v. Caille*, 289 Mich. 74, 286 N.W. 163 (1939).

The evidence did establish, and I therefore find, that Mrs. Sumpter knew that she and her husband were jointly indebted to the IRS at the time they transferred the properties to the trust. In August, 1987, the Sumpters received a notice of assessment for about $150,000 for the 1981 and 1982 tax years. They had also previously received notices of assessment for about $22,000 in taxes owing from 1984 and 1985. Second notices of assessment and demands for payment for all tax years were sent to the Sumpters in the last few days of 1987. A final notice (Notice of Intention to Levy, Exhibit 30) was mailed to the Sumpters on April 7, 1988, and was received by Mrs. Sumpter on April 12, 1988.

In response to these assessments, the government alleged that the Sumpters transferred all of their valuable real estate to the trust in order to defeat the IRS' collection efforts. The recipient of the transfers, according to the government, was no more than a shell set up to receive fraudulent transfers such as these and was the mere alter ego of the Sumpters. Although the government did not specifically request that I pierce the veil of the trust, it

did ask that I find the trust to be just an instrumentality in the Sumpters' attempt to evade or defeat the taxes owed. Accordingly, a closer look at the trust is necessary.

The Sumpters executed a trust instrument (Exhibit 5) on May 1, 1979, in which their minor children were named as the beneficiaries. The first trustee was Mr. Sumpter's stepfather. Subsequently, a new trustee was named. She was the Sumpters' next-door neighbor; a person entirely without business experience, her main qualification for the job was that she was like Mrs. Sumpter's "second mother." The present trustee, a licensed realtor whose place of business is next door to Mr. Sumpter's law office, is also a friend of the Sumpters.

On January 11, 1988, a mortgage on the six real estate parcels was executed by the Sumpters in favor of the trust (Exhibit 6); it was recorded at the Cheboygan County Register of Deeds the same day at Liber 486 pages 593 and 594. This mortgage was given to the trust to secure a $90,000 loan from the trust to the Sumpters, for which the Sumpters executed a promissory note payable to the trust and dated January 11, 1988 (Exhibit 25). On April 23, 1988, the Sumpters deeded the six properties to the trust.[14]

The IRS' second notices were sent at the end of December, 1987. The $90,000 "loan," secured by mortgages on all of the Sumpters' valuable properties, followed about two weeks later. The Final Notice (Exhibit 30), which Mrs. Sumpter received on April 12, 1988, advised the Sumpters that the IRS intended to levy upon their property within a matter of days. Indeed, on April 21, 1988, the IRS agent in charge

of the case prepared and signed a Notice of Federal Tax Lien, Exhibit 22. Unfortunately for the government, the Notice of Lien was not recorded until May 3, 1988. By then, of course, the Sumpters had already transferred all of their valuable assets to their children's trust and, more importantly, recorded the conveyances.[15] I conclude that by proving these events, the government has established two of the traditional badges of fraud: (1) a transaction between family members; and (2) a suspicious chronology and timing of events.

The government also argued that the transfers were without consideration. Mrs. Sumpter testified that the properties were conveyed to the trust in payment of the indebtedness secured by the mortgages—in essence, deeds in lieu of foreclosure. Exhibits 27 and 28, the trust's bank statements, corroborate that the trust disbursed $90,000 on or about January 12, 1988, approximating the date on which the Sumpters signed a promissory note in the same amount in favor of the trust and the date they executed the mortgages.

The evidence thus tends to show that the January, 1988 mortgages were given in return for a valuable consideration. The adequacy of that consideration is established by Exhibit B, the tax assessments for the properties in question. These showed that the tax assessors, at least, believed that the properties were collectively worth $120,400. Mrs. Sumpter testified that some of these properties were encumbered by prior liens, so that the Sumpters' aggregate equity in the properties was about $90,000. The record contains no evidence in rebuttal.

---

**14.** Five of the six properties were conveyed by quitclaim deeds signed by the Sumpters in April, 1988 (Exhibits 7 and 8). The other property was conveyed by means of the trust itself, which contained a provision transferring "the property described in the scheduled annexed" to the trust. Although the trust was executed in 1979, the property description was not annexed and, therefore, the transfer was not effective until April of 1988.

**15.** Since a transfer of real property in Michigan is of course valid as between the grantor and

grantee even without recording, *Irvine v. Irvine*, 337 Mich. 344, 60 N.W.2d 298 (1953); *Turner v. Peoples State Bank*, 299 Mich. 438, 450, 300 N.W. 353, 357 (1941), the real purpose for recording a deed or mortgage is to insulate the transfer from the claims of the grantor's creditors. Mich.Comp.Laws §§ 600.6051, 565.29; *Williams v. Dean*, 356 Mich. 426, 433, 97 N.W.2d 42 (1959). Thus there was an obvious motive for the Sumpters to "beat the IRS" to the Register of Deeds.

The second set of transfers occurred on April 23, 1988, when the Sumpters deeded the properties in fee simple to the trust. The government alleged that these transfers were without consideration. However, release from an indebtedness may be sufficient consideration to shield a conveyance from attack as fraudulent. *Grand Rapids Nat'l Bank v. Ford,* 143 Mich. 402, 107 N.W. 76 (1906). Exhibit 9, the discharge of the trust's mortgages, executed on April 23, 1988 and recorded three days later, together with the uncontested testimony of Mrs. Sumpter, establish that the properties were conveyed outright only as payment of the debt to the trust. If the January and April transactions are collapsed into one, it becomes clear that the Sumpters in effect "sold" their real estate to the trust in January for $90,000, a fair price. So long as the trust paid the Sumpters $90,000, as I so find, the conveyances were for a valid consideration. Therefore, that badge of fraud is not present here.

The government argued that the Sumpters were insolvent when they transferred the properties. This badge of fraud was established by Exhibit 4, the personal financial statement submitted by the Sumpters to the IRS on May 6, 1988.

Finally, the government relied on the irregularity of the transactions and other unusual surrounding circumstances as an independent badge of fraud. The main irregularity, the government maintained, was the illegality of the trust's $90,000 loan to the Sumpters. The trust explicitly prohibited the trustee from making "loans, directly or indirectly, to the Settlor." Nevertheless, the Sumpters, who seemingly controlled the nominally independent trustees, caused the trust to loan them $90,000.

What was the impetus for this clearly improper conduct? The government urged me to find that the Sumpters caused the loan to be made merely to cover the fraudulent transfer of their properties to the benefit of their children. It pointed to the fact that Mrs. Sumpter was unable to trace the proceeds of the "loan." All she was able to say, and without corroboration at that, was that she thought $40,000 of the $90,000 borrowed was paid to a bank in satisfaction of a loan, that $12,000 went to Laura Arnold, also to repay a loan, and that the rest ($38,000) was paid to her husband's professional corporation.[16] Mrs. Sumpter offered no explanation as to why the Sumpters made payments to the bank and Ms. Arnold despite the fact that, according to Mrs. Sumpter's own testimony, the underlying obligations were incurred by Mr. Sumpter's professional corporation. Moreover, Mrs. Sumpter knew of no immediate need to repay the bank or Ms. Arnold in January, 1988.

Whenever the P.C. apparently needed money, it borrowed it directly from the trust. Exhibit 25 shows two loans to the P.C., totalling $80,000, before the January, 1988 loan to the Sumpters, and another ten loans to the P.C. after the January, 1988 loan to the Sumpters, aggregating $177,900. What earthly need did the P.C. have for another $38,000 in January, 1988? No explanation was offered.

Even if the P.C. needed the $38,000 received in January, 1988, why didn't it borrow the money directly from the trust, as it had done before and after? Since the Sumpters received no individual benefit from the trust's loan,[17] the only purpose for designating them as the loan recipients was to allow the Sumpters to encumber the property to the trust, and ultimately to transfer it out of their estate entirely.

---

**16.** The government might better have argued § 727(a)(5) as to these loan proceeds. As noted by the court in *In re Ridley,* 115 B.R. 731, 737, 24 C.B.C.2d 163 (Bankr.D.Mass.1990) (citations omitted),

A satisfactory explanation of diminution of available assets must consist of more than vague or indefinite references, evidence or explanations, or an uncorroborated hodgepodge of financial transactions.... There-

fore, discharge will be denied where the debtor makes only a vague evidentiary showing that the missing assets involved have been used to pay unspecified creditors, or where the debtor fails to provide corroborative documentary evidence to confirm his explanation.

**17.** The $40,000 loan repayment to the bank removed a lien on properties subsequently transferred to the trust.

And the only reason they had for doing this was to stymie the IRS' efforts to collect the outstanding taxes.

Other anomalies abound. The Sumpters' 1988 federal income tax return (Exhibit 23a), Schedule E, reports no rental income whatsoever and no rental expenses in 1988 even though they asserted that they owned the properties transferred to the trust until late April of that year. Mrs. Sumpter had no explanation for this fact. Furthermore, the return does not report any gain or loss from (or for that matter, the very fact of) the real estate transfers. Mr. Sumpter's W-2 (Wage and Tax Statement) discloses that he earned $37,500 from his P.C. in 1988. Yet Mrs. Sumpter said that they had no personal checking account and could not explain how they paid their normal living expenses. Mrs. Sumpter testified that she believed that the land and building from which Mr. Sumpter operated his law practice had been deeded to the trust many years ago. Aside from that (unproven) allegation, however, she could offer no explanation of how the trust was able to acquire hundreds of thousands of dollars of wealth.[18] The government persuasively argued that there is an inference that the Sumpters used the trust as a conduit; that is, they put their own income into the trust and then "borrowed" it back as needed.

I noted in connection with the "continuing concealment" exception to the one-year limitation in § 727(a)(2) that there was no evidence that the Sumpters received the rental income from the properties transferred to the trust after the date of transfer. But there is also no proof that the trust received that income. Mrs. Sumpter could not identify in the trust's bank statements any deposits subsequent to the April 23, 1988 date of transfer corresponding to rental receipts or any checks or withdrawals corresponding to payments for mortgage, land contract, property tax or maintenance relating to the transferred properties.

Finally, as discussed earlier, Mrs. Sumpter's statement of financial affairs discloses no payment to the trust to disencumber the Sumpters' household furnishings, nor does Schedule A-2 disclose the continued existence of a lien on the furnishings. Yet Exhibit 3, another document submitted to the IRS and signed by Mrs. Sumpter under penalties of perjury, indicates that as of August 16, 1989, only 42 days pre-petition, the trust had a $13,000 lien on the household goods. Because there was no promissory note produced evidencing a debt of the Sumpters to the trust other than the January 11, 1988 note for $90,000, I find that no such $13,000 lien on the household goods ever existed. Thus, I find that the schedules and statement of financial affairs were correct, and that Mrs. Sumpter lied to the IRS about this fictitious encumbrance.

"Although 'badges of fraud' are not conclusive and are more or less strong or weak according to their nature and the number occurring in the same case, 'a concurrence of several badges will always make out a strong case.'" *United States v. Leggett*, 292 F.2d 423, 427 (6th Cir.), *cert. denied*, 368 U.S. 914, 82 S.Ct. 194, 7 L.Ed.2d 131 (1961) (quoting *Bentley v. Caille*, 289 Mich. at 78, 286 N.W. 163). If even one badge of fraud exists, the burden of proof may shift to the defendant. *Erdman, supra; In re Butler*, 38 B.R. 884, 888 (Bankr.D.Kan. 1984); *In re Loeber*, 12 B.R. 669, 675, 4 C.B.C.2d 448 (Bankr.D.N.J.1981). In this case, several badges have been proven. Consequently, the burden shifted to Mrs. Sumpter to dispel the inference of fraud. I conclude that she failed to meet this burden.

The impression remains, therefore, that the Sumpters intentionally transferred their valuable real estate into a trust which they controlled at a time when they were insolvent for the purpose of evading the IRS' attempts to collect a tax. Accordingly, I conclude that the government has proven a cause of action against Mrs. Sumpter under § 523(a)(1)(C) and therefore

18. As of May 6, 1988, according to Exhibit 4, the Sumpters' Statement of Financial Condition and Other Information, which they signed under penalties of perjury and submitted to the IRS, the trust had a value of $190,000.

that the liabilities owed to the IRS should be excepted from the discharge issued in this case under § 727(a). A judgment to this effect has been entered contemporaneously herewith.